UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. ACTION NO. 3:22-00120-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| JOHN S. LEE (01) | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 20] filed by Defendant John S. Lee ("Lee"). For reasons stated below, it is recommended that the motion be DENIED.

### Background

In the pre-dawn hours of March 17, 2022, Louisiana State Police Troopers Ryan Baker and William Seymour conducted a "trash pull"[1] of the city-supplied plastic trash container that was situated near the roadway of suspected drug dealer Lee's residence at 800 South Walnut Street, Tallulah, Louisiana. The trash pull uncovered evidence of opened, vacuum-sealed plastic bags that had white residue, which field-tested positive for cocaine. The officers also found, among other things, small plastic bags consistent with drug distribution at lower levels, plus a marijuana seed adhered to a Red Bull can.

Armed with the evidence from the trash pull, together with surveillance data of Lee that the officers had accumulated over the past year, Madison Parish Sheriff's Deputy Jeremy Purvis applied for and obtained a search warrant for the 800 South Walnut Street residence at 6:41 a.m.

---

[1] A "trash pull" refers to the law enforcement practice of searching a suspect's trash that has been placed at the roadway for collection. The officers remove the can, sometimes replacing it with another one to avoid detection. The officers then physically sift through the suspect's trash looking for incriminating evidence such as narcotics and drug paraphernalia.

on March 17, 2022, from the Honorable Laurie Brister, Sixth Judicial District Court, Parish of Madison, State of Louisiana. Later that same morning, officers executed the search warrant on 800 South Walnut Street wherein they uncovered narcotics.

On May 25, 2022, a federal grand jury returned a five-count indictment against Lee for conspiracy to possess with intent to distribute cocaine, possession with intent to distribute cocaine, possession with intent to distribute cocaine base, possession of firearms by a convicted felon, and possession of a firearm during a drug trafficking crime, in violation of 21 U.S.C. §§ 841(a)(1) and 846, 18 U.S.C. §§ 2, 922(g)(1), and 924(c)(1)(A). The indictment also seeks forfeiture of a Taurus pistol, model PT809 and a Smith & Weston pistol model Airweight, plus associated ammunition. The charged conduct took place no later than March 14-17, 2022. On June 1, 2022, Lee entered a plea of not guilty on all counts.

On July 13, 2022, Lee filed the instant motion to suppress all evidence and statements obtained as a result of the warrantless search of his trash container.[2] Because the subsequent warrant issued for the search of Lee's home was grounded, in part, on the evidence found in the trash pull, he also seeks to suppress all evidence found in the search of his home.

The government filed its opposition to the motion to suppress on August 3, 2022. [doc. # 22]. Thereafter, the court held a September 21, 2022 hearing. The matter is ripe.

### Relevant Testimony, Plus Video and Documentary Evidence

Two witnesses, Louisiana State Police Troopers Ryan Baker and William Seymour, testified at the nearly two and one-half hours-long hearing. Both witnesses were called by the

---

[2] Lee's motion also referred to a traffic stop of another individual, Ajuana Hicks, by Special Agent Smith that culminated with a consensual search of the vehicle and the discovery of suspected cocaine, crack cocaine, and a firearm. However, there is no indication that Lee's motion is challenging either his or Hicks's traffic stop, or, if he is, that he has standing to do so for Hicks's vehicle.

government. The government also admitted into evidence seven exhibits that consisted mostly of photographs of seized evidence and the subject trash container. *See* doc. # 27. Lee admitted into evidence seven exhibits comprised mostly of photographs of the trash container and two videos. *See* doc. # 28.

The court summarizes relevant testimony and evidence, as follows:

Ryan Baker is a veteran of the Louisiana State Police ("LSP") with over fourteen years' experience and is presently assigned to the narcotics division for northeast Louisiana. Since January 2019, he also has served as a task force officer with the Drug Enforcement Agency. William Seymour is an LSP trooper, with eight years' experience. He is assigned to Region 3 Monroe Narcotics and also serves as a task force officer with the United States Postal Inspection Service.

In 2021, Baker began assisting the Madison Parish Sheriff's Office ("MPSO") with an investigation into narcotics sales and trafficking by Lee, who resided at 800 South Walnut Street, Tallulah, Louisiana (hereinafter sometimes referred to as the "residence" or "Lee's residence"). Trooper Baker and MPSO Deputy Jeremy Purvis were the lead investigators on the case. Trooper Seymour assisted Trooper Baker with surveillance on the case.

On or about March 14, 2022, the MPSO used a confidential informant in an attempt to make a controlled purchase from Lee, while Baker and Seymour conducted surveillance. Baker observed Lee's participation in what appeared to be a hand-to-hand transaction that possibly involved drugs.

Three days later, at approximately 4:00 a.m. on Thursday, March 17, 2022, Baker and Seymour had just completed a separate investigation in the Tallulah area and decided to drive by

Lee's residence where they spotted a full trash container situated at the roadway.[3] Because of the trash container's placement near the roadway, Baker determined that the trash had been abandoned for pickup and, consequently, eligible for a trash pull. Prior to observing the trash container near the road, Baker had no intention of conducting a trash pull. He also had not noticed the position of the trash container before that date.[4]

Baker and Seymour quickly devised a plan to covertly switch out the trash container with another empty container and to arrange for a truck to haul away the full container. Baker and Seymour found an empty trash container at a vacant lot around the corner and stealthily carried it to Lee's residence where they proceeded to swap it out for the residence's full container.[5]

Both the original trash container and the substitute trash container were blue and had "Property of Madison Parish Police Jury" imprinted on their sides. The Madison Parish Police Jury furnishes garbage containers to parish residents free of charge, but the containers remain the property of Madison Parish. *See* Parish Residence Garbage Container Receipt; Gov.'t Exh. 1.

According to Baker, the full container was situated approximately three feet, give or take a foot or so, from the roadway. Baker added that they placed the replacement container in the approximate location where the full one had been. However, Baker later clarified that the container that they pulled had been closer to the road than the substitute container

Seymour testified that the full container had been right beside the roadway. According to him, they placed the substitute container to the right side of the full container. Seymour

---

[3] The container was so full that the lid would not close completely.

[4] Baker is acquainted with trash pulls and has conducted about ten trash pulls as a case agent, plus assisted other agencies with their trash pulls.

[5] The officers make it a practice to switch the trash containers so as not to alert the suspect to the investigation should the suspect awaken and notice that his trash container is missing.

4

believed that the full container had been placed approximately two to three feet away from the roadway. Seymour did not know whether the container had been moved from another location to its abandoned-for-trash-collection pickup location.

When looking at the residence from the roadway, there is a carport on the left side that also includes the front door. The right half of the house, again as viewed from the street, has two windows. At the right side of the house, a six-foot high wood privacy fence runs from the edge of the house towards the street for an undetermined length, but, judging from the photographs, perhaps up to twelve feet. On the right side of the fence, again as observed from the street, is an unenclosed, grassy lot. On the left side, there is an unenclosed concrete surface that connected to the concrete driveway. The fence borders the length of the concrete (extending from the house towards the street) on the right side of the house. From where the fence stops until the street is a grassy (or, in parts, dirt) strip of land that is approximately nine and three-quarters feet wide.[6]

When Baker and Seymour spotted the full trash container, it was situated in the grassy/dirt strip between the end of the fence and the road. Government Exhibit 6 represents still images of a video that Baker took the morning of March 17, 2022, shortly before the agents executed the search warrant for Lee's residence. The images depict the substitute trash container placed by Baker and Seymour. One photograph suggests an up to two-foot gap between the bottom of the container and the edge of the fence. Baker testified that when they originally encountered the full container, it had been located about one-half to three-quarters of a

---

[6] Defendant adduced a photograph with a tape measure that extended 93 inches to the street from the bottom of a blue trash container that had been placed at the end of the fence. *See* Def. Exhs. The trash container appears to be up to two feet wide at its base but is wider at the top. Therefore, 93 inches plus 24 inches equals 117 inches or 9.75 feet. Baker likewise estimated the grass strip to be between ten and twelve feet wide.

container closer to the roadway. Moreover, the substitute container was not where the troopers had placed it earlier that morning.

Government Exhibit 7 is a series of photographs taken by Trooper Baker on July 12, 2022. The photographs depict a blue trash container at Lee's residence located between the terminating edge of the wood fence and the street. The container appears to be roughly in the same location as the container in Exhibit 6 but rotated 90 degrees. According to Baker, the trash container depicted in the photograph was situated about one-half of a container width closer to the fence than the full container that he and Seymour "pulled" on March 17, 2022.

Lee introduced an apparently un-zoomed version of a photograph taken by Trooper Baker on July 12, 2022, that showed at least two other trash containers from neighboring residences that were placed adjacent to the roadway. However, the container affiliated with Lee's residence is located farther from the road than the containers from the nearby residences.

Lee also adduced evidence indicating that the trash pickup day for the residence was on Sunday. However, March 17 and July 12, 2022, fell on a Thursday and Tuesday, respectively. Lee further introduced a video, over the Government's objection, that showed an unidentified garbage truck passing a trash container, apparently in front of the Lee residence, but failing to stop to empty the container.

Baker explained that when deciding whether to execute a trash pull, he considers whether the trash collector, i.e., the garbage truck driver, would think that the container had been placed for collection. Baker stated that he would consider abandoned anything that was in the grassy area from the terminating end of the wood privacy fence to the roadway. In fact, a seemingly unwanted or discarded wheel and vehicle transmission appear next to the trash container in more than one photograph, even though the container is located within two feet of the end of the privacy fence.

After swapping the trash containers in the pre-dawn hours of March 17, 2022, Baker and Seymour carried the full container to a nearby street and loaded it into a waiting pickup truck that had been brought by Deputies Ezell, Varner, and Hargrave. They drove the container to a predetermined location outside of the city limits and sifted through the contents of the container, discovering a cut-open, vacuum-sealed plastic bag with a white residue that tested positive for cocaine. The vacuum-sealed bags suggested that they came from a "brick" or large quantity of cocaine.

Based on the evidence from the trash container, plus other observations, the investigators applied for a search warrant for the residence at 800 South Walnut Street, Tallulah, Louisiana. MPSO investigator Jeremy Purvis completed the affidavit in support of the search warrant. Judge Brister signed the search warrant at approximately 6:40 a.m. on March 17, 2022. At around 10:00 a.m. later that same morning, Baker and other investigators executed the search warrant at the residence, where they found narcotics, plus evidence linking Lee to the residence.

## Law and Analysis

Lee contends that law enforcement agents violated his Fourth Amendment rights when they entered his property, seized his trash container, and then searched it without a warrant. Consequently, he seeks to suppress, not only all evidence found in the trash container, but also all evidence discovered in his residence pursuant to the search warrant, which was issued based on the "illegally obtained" evidence from the container.[7] In other words, all evidence seized in this case should be suppressed as "fruit of the poisonous tree."

---

[7] Lee also seeks to suppress any and all statements obtained in this matter. However, there is no indication that Lee made any statements to law enforcement.

"The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006). The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV.

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). However, when the government conducts a search without a warrant, then the government bears the burden of proving, by a preponderance of the evidence, that the search was constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *United States v.*

*Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

Moreover, "a criminal defendant seeking suppression must show that 'his *own* Fourth Amendment rights [were] infringed by the search [or] seizure which he seeks to challenge.'" *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (quoting *Byrd v. United States*, ___ U.S. ___, 138 S. Ct. 1518, 1526 (2018)). This concept is described as one of Fourth Amendment standing, which "is not distinct from the merits and 'is more properly subsumed under substantive Fourth Amendment doctrine.'" *Byrd,* 138 S. Ct. at 1530 (quoting *Rakas v. Illinois*, 439 U.S. 128, 193 (1978)).

A defendant can establish his personalized interest in the search in one of two ways: 1) he may object to the physical intrusion of a constitutionally protected area in which he has a property interest; and 2) he may object to government action that violates a reasonable expectation of privacy in the place searched. *Beaudion, supra* (citations omitted). "Either way, the Fourth Amendment standing inquiry is both defendant- and place-specific: it requires that a *particular* defendant (the suppression movant) have a property or privacy interest in a *particular* place (the area searched). *Beaudion*, 979 F.3d at 1097 (citation omitted).

The "reasonable expectation of privacy" inquiry requires "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *United States v. Turner*, 839 F.3d 429, 434–35 (5th Cir. 2016) (citation and internal quotation marks omitted). "The reasonableness of

an expectation of privacy turns on our societal understanding about what deserves protection from government invasion." *Id*. (citations and internal quotation marks omitted).

In 1988, the Supreme Court held that "the Fourth Amendment [does not] prohibit[ ] the warrantless search and seizure of garbage left for collection outside the curtilage of a home." *California v. Greenwood*, 486 U.S. 35, 37 (1988). In so doing, the Court confirmed that the warrantless search and seizure of garbage bags left at the curb outside the house would violate the Fourth Amendment only if defendant "manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable." *Id*. at 39 (citations omitted).

The court went on to find that a defendant has no reasonable expectation of privacy in the items placed in their garbage and deposited "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it . . ." *Id.* at 40-41 (internal quotation marks and citation omitted). After all, "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id*. at 40.

Applying the foregoing principles to the present case, the court observes that Lee did not adduce evidence to show that he harbored a subjective expectation of privacy in the contents of the subject trash container. To be sure, Lee's attorney posed questions to Baker in an attempt to show that, based on Lee's efforts to insulate himself from drug transactions, he surely also must have wanted to maintain the secrecy of the contents of his trash container. However, Baker was unable to concur, at least in part, because, sometimes, people become complacent.

Even if Lee had shown that he harbored a subjective expectation of privacy in the contents of the trash container, that expectation is not one that society would recognize as

reasonable. First, the container was not within the curtilage of the residence. The Supreme Court has recognized that,

> curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987) (citations omitted). Here, the container was placed on a grassy strip between a concrete area that abutted the house and the street. There is no evidence that Lee used the grassy strip for any other purpose or that he took any steps to protect the area from observation by passersby. In fact, as best as the court can tell, the container was situated, so that it could be emptied by the garbage collector. *See* discussion, *infra*; *United States v. Beene*, 818 F.3d 157, 162–63 (5th Cir. 2016) (driveway not part of curtilage); *United States v. Moffitt*, 233 Fed. App'x. 409, 411 (5th Cir. 2007) (driveway and front yard were not protected curtilage).

  Second, the court finds that the subject trash container was placed in an area particularly suited for public inspection and for the implicit purpose of trash collection. Whether the bottom of the trash container was situated three, four, five, or six feet away from the road is immaterial. The court finds by a preponderance of the evidence that there was *at least* a three-to-four-foot gap between the edge of the fence and the bottom of the container, which also means that the container was no more than four to five feet from the street. Therefore, the position of the container was such that any scavenger, snoop, or other member of the public would reasonably believe that the contents of the container had been discarded and presented fair game for reclamation. The court is further persuaded that neither Lee, nor any other reasonable resident,

would have protested if the trash container had been emptied by the trash collector. In fact, the container was so full that the lid could not be closed. Moreover, there is evidence that the practice of the neighborhood was to leave the trash containers near the street, rather than moving the containers back and forth for collections purposes. Finally, the containers themselves are labeled to make it clear to homeowners that they are discarding their items into a receptacle that is owned by the parish.

In sum, consistent with *Greenwood*, the undersigned finds that the warrantless search and seizure of Lee's trash container does not violate the Fourth Amendment.[8]

Lee's challenge to the subsequent search warrant is grounded upon his contention that it was tainted by the unconstitutional search and seizure of the contents of his trash container. However, the court has rejected this argument. *See* discussion, *supra*. Nonetheless, during the hearing, Lee also questioned two related aspects of the warrant application. Specifically, he challenged Deputy Purvis's representation that the trash can was "on the roadway" and located "to the north of the privacy fence . . ."

"Ordinarily, evidence obtained from a search is admissible where probable cause for a search warrant is founded on inaccurate information, so long as the officer's reliance on the

---

[8] *See United States v. Jackson*, 728 F.3d 367, 375 (4th Cir. 2013) (no Fourth Amendment violation where the trash can was in the common grassy area with common sidewalks readily accessible to all, even though the can had not been taken to where the garbage collector regularly collected it); *United States v. Redmon*, 138 F.3d 1109, 1113 (7th Cir. 1998) (no reasonable expectation of privacy where trash can was not curbside, but was placed at the front of a joint garage on a shared driveway-sidewalk); *United States v. Hedrick*, 922 F.2d 396, 400 (7th Cir. 1991) (no reasonable expectation of privacy where the distance between the garbage cans and the public sidewalk was relatively short and the garbage was collected from that location, which was clearly visible from the sidewalk); *United States v. Long*, 176 F.3d 1304, 1309 (10th Cir. 1999) (once defendant placed his trash on the trailer, adjacent to a public thoroughfare for collection, he defeated any reasonable expectation of privacy in the garbage).

warrant is objectively reasonable." *Moreno v. Dretke*, 450 F.3d 158, 169–70 (5th Cir. 2006) (citation omitted). One exception to this rule is where the affidavit that supports the warrant contains *materially* false statements or omissions that "are the product of deliberate falsehood or of reckless disregard for the truth." *Id.* (citation and internal quotation marks omitted).

In this case, there is no evidence that the two errors in Purvis's warrant application were intentional, malicious, or even reckless. In fact, the alleged errors were immaterial to the issuance of the warrant because even if the location of the trash container had been properly described as detailed by Baker and Seymour, there was no Fourth Amendment violation. *See* discussion, *supra*. Therefore, the good-faith exception to the warrant requirement applies, and the government's discovery and seizure of the evidence inside the residence was proper. *See United States v. Smith*, 609 Fed. App'x. 180, 186 (5th Cir. 2015).

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 20] filed by Defendant Lee be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 18th day of October, 2022.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE